**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                   :
NATIONAL REPROGRAPHICS, INC.,      :   CIVIL ACTION NO. 08-3969 (MLC)
                                   :
      Plaintiff,                   :   MEMORANDUM OPINION
                                   :
      v.                           :   DATED NUNC PRO TUNC:
                                   :   NOVEMBER 24, 2008
ROBERT J. STROM, et al.,           :
                                   :
      Defendants.                  :
_____    :
```

**COOPER, District Judge**

Plaintiff, National Reprographics, Inc. ("NRI"), commenced this action to, inter alia, enjoin defendant FLM-Reprographics, Inc. ("FLMR"), a competing company, from employing defendant Robert J. Strom.[1] (Dkt. entry no. 3.) Strom was employed by NRI as the District Manager for its District of Columbia region from September 2005 through August 2008. (Dkt. entry no. 19, Def. Br. at 2-4.) Strom voluntarily resigned from NRI in August 2008 with the intention of joining FLMR. (Id. at 4.) NRI contends that Strom's employment with FLMR violates the terms of his employment agreement with NRI, which contains a non-competition clause for

---

[1] The named defendant in this action is FLM-Graphics ("FLMG"), rather than FLMR. FLMR, until April 1, 2008, was organized as a portion of FLMG's business. (See infra Background I.C.) FLMG and FLMR today are distinct businesses, providing different services, although they share office space and board members. (Def. Br. at 5 n.2.) FLMG provides off-set printing, while FLMR is a reprographics company. (Id.) For the purposes of this preliminary injunction motion, the Court will treat FLMR as the proper defendant.

the purpose of protecting NRI's confidential and proprietary information. (Dkt. entry no. 3, Pl. Br. at 2.) NRI asserts that, as one of its top twelve executives for three years, Strom had unfettered access to NRI's business strategies and goals, including plans to develop and grow NRI's investment in the New Jersey and Philadelphia metropolitan markets where FLMR competes with NRI. (Id.; dkt. entry no. 3, Fromowitz Aff. ¶ 47.) Strom and FLMR (collectively, "defendants") contend that NRI has no legitimate business interest in preventing Strom from joining FLMR because Strom does not possess any proprietary secrets or confidential information that require protection. (Def. Br. at 9.) Defendants also contend that the non-competition clause in the employment agreement is unenforceable because it is both ambiguous and unreasonable in geographic scope. (Id.)

A temporary restraining Order was issued on August 8, 2008 preventing Strom from commencing employment with FLMR pending a hearing on the Motion for Temporary Restraining Order and Preliminary Injunction filed by NRI. (Dkt. entry nos. 3, 5.) Defendants subsequently filed a Motion to Dissolve or Modify the Temporary Restraining Order, which the Court denied after a hearing held on August 28, 2008. (Dkt. entry nos. 13, 18.) The parties conducted expedited discovery and provided the Court with declarations, depositions, and accompanying exhibits as cited here.

2

The Court has considered the papers submitted by the parties and heard oral argument on September 11, 2008.  The Court hereby issues its preliminary findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a)(2).  The Court, for the reasons stated herein, will grant NRI's application for a preliminary injunction.

## BACKGROUND - FACTUAL FINDINGS

Because of the fact specific nature of this motion, the Court will describe the facts in extensive detail below.

## I.   The Parties

### A.   NRI

NRI, founded over 100 years ago, is a family-owned printing business with 12 commercial facilities in New York, the District of Columbia, New Jersey, Philadelphia, and Boston, and approximately 11 franchise locations.  (Dkt. entry no. 1, Compl. at 2; Fromowitz Aff. ¶ 3.)  NRI holds approximately 4,000 accounts nationwide and provides reprographics services to the architectural, engineering, and construction ("AEC") industry, as well as, inter alia, facilities management, offset printing, hardware and software sales and installation, and digital imaging services to a broad range of customers.  (Compl. at 2; dkt. entry no. 19, Ex. D, 8-26-08 Magid Dep. at 15-16.)  "Reprographics" describes all reproduction and document management needs of the AEC industry, including color and black-and-white copying, and

3

large and small format copying of blueprints and design drawings.
(Magid Dep. at 15-16; dkt. entry no. 19, Ex. E, 8-29-08 Fromowitz
Dep. at 143-44.)[2]

NRI devotes significant time to strategic planning to remain
competitive, differentiate itself from competitors, and identify
new areas for growth.  (Dkt. entry no. 24, Ex. A, Magid Aff. ¶
10.)  It believes that its success has stemmed from the
development of customer contacts and relationships, as well as
from confidential pricing models tailored to meet its customers'
specific needs.  (Compl. at 2.)  NRI thus spends a significant
amount of resources to develop and maintain customer good will.
(Id.)  NRI's strategy also relies on quantitative analysis of
financial results (e.g., revenues by source and costs for goods
and labor). (Magid Aff. ¶ 10.)

NRI's business is structured around various committees
established to plan and develop its strategies. (Id. ¶ 11.)
NRI's Executive Committee ("EC") meets on a regular basis to keep
informed of all business dealings, and to address pressing issues
that must be acted upon prior to the quarterly Strategic Business
Planning ("SBP") meetings. (Magid Dep. at 131-32.)  The EC
consists of four members: the Chief Executive Officer, Vice

---

[2]   Reprographics does not involve offset printing or high-
end, full photographic, wide format color or black-and-white
printing.  (Dkt. entry no. 13, Ex. A, Strom Certif. ¶ 3.) It does
include 3-D plastic modeling, which NRI provides.  (Dkt. entry
no. 19, Ex. A., 8-28-08 Strom Dep. at 101-102.)

President of Sales, Vice President of Production, and Chief Financial Officer. (Id.) It makes decisions based on the recommendations and strategic plans developed by the SBP Committee ("SBPC"). (Magid Aff. ¶ 15.) NRI indicates that it does not distinguish between the skills and knowledge of "executives" and those of "senior managers," and that the contribution of NRI's district managers are as important as the contributions of the SBPC members. (Id. ¶¶ 13-14.)

The SBPC sets and develops NRI's annual business strategies and goals. (Magid Dep. at 102.) The SBPC is comprised of "key employees" whom NRI "considers to be executives in [its] corporate structure," including the members of the EC, the Director of Administration, and each District Manager. (Magid Aff. ¶ 12.) The SBPC holds what are described as "collaborative and extremely forthright" discussions that touch on all core aspects of the business, such as: (1) successes and failures; (2) competition; (3) current and potential customers; (4) staff decisions; (5) technological advances; (6) equipment capability, capacity and purchases; (7) revenue trends; (8) marketing plans; (9) development of new products and services; (10) acquisitions; (11) relocation of offices; and (12) geographical expansion. (Fromowitz Aff. ¶ 8; Magid Dep. at 102.)

Copies of the SBPC agendas are distributed to each member, along with the planning documents for each region. (Fromowitz

5

Aff. ¶ 14.)  District managers present confidential presentations and distribute written reports at the SBP meetings regarding, inter alia, their region's overall business issues and strategies, and specific strategies for pricing, customer information, future sales initiatives, and marketing.  (Id. ¶¶ 10-11.)  Each member is aware that all information discussed and distributed at the SBP meetings is confidential, and not to be disclosed, divulged, or used in any way outside of NRI.  (Id. ¶¶ 11, 25.)  Materials distributed at the meetings are marked "confidential" on each page.  (Id. ¶ 25.)[3]

**B.  Strom**

Strom, age 55, has over three decades of experience working with the AEC industry in the reprographics business.  Strom began his career working for the Louis Frey Company in New York City in the late 1970s.  (Strom Dep. at 7-8.)  Strom founded Action Reprographics, Inc. ("Action"), located in New York City, with a partner in 1987.  (Id. at 9-10.)  Action, which grew to employ 50-60 individuals, was acquired by American Reprographics Company ("ARC") in January 2000.  (Id.)  Upon Action's acquisition, Strom joined Blueprint Independent ("BPI"), an ARC company, which was run out of the office where Action had been located.  (Id. at 13-

---

[3]  Additional committees within the structure of NRI include the sales committee, the technology steering committee, and the production committee.  Minutes from each of these meetings are recorded and distributed to certain NRI employees.

14.)  Strom's employment contract with ARC contained a non-
competition clause restricting Strom from competing with ARC in
New York City for a duration of five years.  (Id. at 15.)  In
September 2005, Strom left BPI to become District Manager of the
District of Columbia region of NRI.  (Id. at 16, 28.)  NRI sent
Strom to the District of Columbia to comply with the ARC non-
competition clause he had previously signed.  (Id. at 29-30.)  As
a result, Strom and his wife relocated to Maryland after living
in New Jersey for 20 years.  (Def. Br. at 2; Strom Dep. at 170-
71.)

   **C.   FLMR**

   FLM Graphics ("FLMG"), a family-owned printing business, was
established in New Jersey in 1972.  (Dkt. entry no. 19, Ex. B, 8-
27-08 Misischia Dep. at 16.)  The company's principal place of
business is in Fairfield, New Jersey.  (Id.)  The company also
maintains a location in Princeton, New Jersey, and has a sales
office in New York City.  (Id.)  The services historically
offered by FLMG included offset printing, media asset management,
high-end wide format color, duplicating, reprographics, and
facilities management.  (Id. at 21.)  The reprographics portion
of FLMG, however, was partitioned out of the company on April 1,
2008, and FLMR was formed to handle the reprographics business.
(Id. at 14-15, 29-30.)

   FLMR primarily provides basic office center services, such

7

as color and black-and-white copying in standard sizes and oversized blueprints, as well as occasional facilities management services, to the AEC industry, while FLMG concentrates on the balance of the services it had historically provided.  (Id. at 39; Fromowitz Dep. at 256-58.)  FLMR shares FLMG's office space in Fairfield and Princeton.  (Misischia Dep. at 15.)  FLMR does not maintain a website, and FLMG's website makes no mention of FLMR or that FLMG does not provide reprographics.  (Id. at 231-32.)  Although FLMG and FLMR each maintain its own sales staff, the companies' salespeople are able to "cross-market" and sell products offered by both companies.  (Id. at 37-38.)  FLMR has managers at both the Fairfield and Princeton locations.  (Id. at 103-05.)  The Fairfield manager currently is paid an annual salary of $78,000, and the Princeton manager is paid between $110,000 and $115,000 per year.  (Id. at 104.)  The Princeton manager who started with FLMR, however, recently was reassigned to a role at FLMG, and that position currently remains vacant. (Id. at 104-05.)

FLMR is NRI's primary competitor in New Jersey. (Id. at 42; Fromowitz Aff. ¶ 41.)  FLMR offers many similar competing products and services for printing, imaging, document production, and facilities management for the AEC industry. (Fromowitz Aff. ¶ 43.)  FLMG asserts it does not compete with NRI because it offers different products and NRI does not have FLMG's superior offset

printing capabilities.  (Misischia Dep. at 42-44.)[4]  Prior to the formation of FLMR in April 2008, however, FLMG competed directly with NRI following NRI's acquisition of Triangle Blueprint Company ("Triangle") in New Jersey in October 2007. (See infra III; Misischia Dep. at 42.)  FLMG competed directly with Triangle for customers since the late 1980s, prior to NRI's acquisition of the company.  (Compl. at 6; Fromowitz Aff. ¶ 42; Misischia Dep. at 42.)  FLMR services many of the same customers in the AEC industry.[5]  (Misischia Dep. at 40-42.) Neither FLMR or FLMG provide three-dimensional ("3-D") modeling and "color management," which is the color calibration in a given customer office location, that NRI provides to its customers.  (Fromowitz Dep. at 256-58.)

FLMR's Princeton office is less than seven miles from one of NRI's New Jersey branch offices.  (Fromowitz Aff. ¶ 31.)  No current employees at FLMR have non-competition clauses in their contracts, although two salespeople have solicitation restrictions.  (Misischia Dep. at 77-78.)

---

[4]  NRI disputes that it does not compete with FLMG.

[5]  Misischia testified that he believes at least six customers have used the services of both FLMR, or formerly FLMG, and NRI, including Turner Construction and Gilbane Construction. (Misischia Dep. at 40-42.)

9

## II.  Strom's Employment with NRI

### A.  Employment Agreement

Strom accepted NRI's offer of employment on August 23, 2005. (Compl. at 3.)  Upon his hiring, NRI and Strom executed a Management Employment Agreement ("Agreement").  (Id.)  The Agreement included, inter alia, a clause restricting Strom, for one year following his termination, from competing with NRI within a 50-mile radius of any NRI branches, as well as a clause prohibiting Strom's use or disclosure of designated confidential and proprietary information of NRI.  (Id.)  The Agreement, in pertinent part, provides:

> 1.  Except in the course of the performance of my duties as an associate of NRI, I will not, either during or after my employment with NRI, for any reason whatsoever, directly or indirectly, in any manner, for my own benefit use, or use for the benefit of or disclose to any other person, firm, corporation or other legal entity, any designs, specifications, formulae, compositions, concepts, memoranda, notebooks, plans, or experiments, know-how relating to pricing, discounts, manufacture, sale or service or other information relating to the products, services or business of NRI obtained by me or disclosed to me in the course of my employment with NRI, including, specifically, any list of NRI's customers or any part of such list, all of which information I hereby acknowledge and agree is confidential and proprietary, constituting a trade secret of NRI.
>
> . . .
>
> 6.  For a period of one (1) year from the termination, for any reason, of my employment with NRI, I will not, within a fifty (50) mile radius of any NRI branch, directly or indirectly, own (as a sole proprietor,

partner, member, shareholder, officer, director or
otherwise) manage, operate, join, control, aid, be
employed by or participate in the management, operation
or control of, or be connected in any manner or
capacity, with any person or entity engaged in
reprographics and/or digital imaging business of the
type or character conducted by the Company at the time
of such termination or that shall then have been in
active development.

(Dkt. entry no. 1, Ex. A, Agreement ¶¶ 1, 6.)

Strom, in addition, expressly represented to NRI that:

[I]n the event of the termination of my employment for
any reason whatsoever, my experience and capabilities
are such that I can obtain employment in trades or
businesses engaged in other lines and/or a different
nature and that the importance of a remedy by way of
injunction will not prevent me from earning a
livelihood.

(Id. at 3.)[6]

Strom did not attempt to negotiate the 50-mile geographic
restriction with NRI or request that any changes be made to the
Agreement before signing.  (Strom Dep. at 38.)  Strom
acknowledges that he understood the Agreement would prevent him
from working for a competing company within 50 miles of NRI's New
York offices, and was aware that the geographical restriction
would encompass certain parts of New Jersey.  (Strom Dep. at 41.)

Strom began employment with NRI as District Manager of the
District of Columbia region on September 7, 2005, with a starting

---

[6]     Strom also agreed to indemnify and hold NRI harmless
against all damages and costs NRI may sustain by reason of any
breach of the Agreement, including reasonable attorneys' fees.
(Agreement at 3.)

salary of $100,000, exclusive of bonuses.  (Compl. at 4; Strom
Dep. at 44-45.)

B.   **Duties, Responsibilities, and Information Sources**

As District Manager of the District of Columbia region,
Strom was responsible for ensuring the region's profitability.
(Magid. Aff. ¶ 17; Fromowitz Dep. at 234.)  The region,
encompassing the same products and services offered by NRI at its
other locations, consists of two commercial facilities, as well
as 20 facilities management placements.  (Magid Dep. at 47-48.)
Throughout his employment, Strom oversaw all production and sales
operations in the region, and participated in corporate
activities, such as strategic business planning.  (Id. at 60.)
Strom's duties required that he involve himself wherever the
company felt his abilities could be useful.  (Id.)  NRI asserts
that under Strom's watch and recommendations, the District of
Columbia branch offices have contributed substantially to NRI's
revenues and profitability.  (Magid Aff. ¶ 17.)  Strom seeks to
minimize his duties in terms of exposure to strategic planning
information, and to trivialize the competitive importance of
information that he received in the course of his duties.  The
record evidence, however, shows Strom was exposed to a
considerable amount of highly sensitive competitive information
that is entitled to protection under New Jersey law.

### 1.   SBP

As one of NRI's District Managers, Strom was a member of NRI's SBPC for three years.  (Compl. at 4; Fromowitz Aff. ¶ 6.) Although Strom was not a member of the more restrictive EC, consisting of only the four top NRI executives, Strom was involved in strategic planning through the SBPC for all areas of the business.  Strom was given access to NRI's procedures, strategies, and financial figures, and attended meetings where the reasons NRI has been successful were determined and discussed.  (Id. ¶ 7-8, 26; Fromowitz Dep. at 167-71.)  Strom became familiar with NRI's products, services, pricing models, confidential customer price lists, customers, customer approaches and proposals, plans to increase costs to customers, revenue trends, marketing plans, and decisions to purchase equipment to service customers.  (Compl. at 4; Fromowitz Aff. ¶ 7-8, 26.) Strom attended at least six SBP meetings during his tenure at NRI.  (Fromowitz Aff. ¶ 13; Magid Dep. at 99-100.)[7]  Moreover, Strom was given copies of companywide NRI SBP documents, as well as specific documents for each region.  (Fromowitz. Aff. ¶¶ 12, 14; Strom Dep. at 62-66.)  Strom understood that the SBP

_____

[7] Strom attended SBPC meetings on the following dates: November 1, 2005; June 6, 2006; July 18, 2007; October 16, 2007; and March 11, 2008.  Strom was present for one additional meeting held between June 2006 and October 2007.  (Fromowitz Aff. ¶ 13; Magid Dep. at 101.)

information was confidential and not to be disclosed outside of
NRI. (Strom Dep. at 101.)

### 2.   Customers

Strom had knowledge of all NRI customers in the District of
Columbia region. (Fromowitz Dep. at 53.) NRI, a business based
on customer relationships, considers its customer lists to be
confidential. (Id.) Strom had close personal relationships with
the key decision makers in NRI's major accounts in his region,
and generally had direct customer contact with representatives
from all of the region's large accounts. (Magid Dep. at 65-66;
Fromowitz Dep. at 122.) Strom, at times, assisted account
executives with sales calls and managing customer relations.
(Fromowitz Aff. ¶ 29.) Strom was told whenever a customer was
dissatisfied with the products or services of NRI, and received
NRI's Service Problem Summary ("SPS") Reports, summarizing
customer complaints, which at times led to follow-up contact with
customers. (Strom Dep. at 84-88, 93.) Strom, in addition, had
information about, and relationships with, District of Columbia
customers that also have offices in New Jersey, including Keast &
Hood Company, Turner Construction, and Gilbane Construction.
(Fromowitz Aff. ¶ 29.)[8]

---

[8]   Turner Construction and Gilbane Construction are both
customers of NRI's New Jersey branches, as well as the District
of Columbia region. (See dkt entry no. 19, Ex. F, 9-4-08 Teti
Dep. at 24-25.)

14

Strom received copies of the District of Columbia Sales Analysis Report, which is a report that discusses each region's customers, including the products NRI is selling or attempting to sell to each one.  (Fromowitz Dep. at 53, 135.)

### 3.  Pricing

Strom had in-depth knowledge about pricing for NRI's customers, and "absolutely" played a role in determining pricing. (Magid Dep. at 63-64; Fromowitz Dep. at 56.)  NRI's pricing models and strategies include concepts for deriving additional revenues from particular customers and prospective customers, which NRI considers a distinct competitive advantage.  (Fromowitz Aff. ¶¶ 9, 26.)[9]  Pricing for every job in the industry is not uniform, and NRI tailors and customizes its approach for each customer.  (Fromowitz Aff. ¶ 30; Fromowitz Dep. at 243-44.) NRI's production management and sales staff both play key roles in determining the "various and sundry ways in which you can charge for . . . services."  (Magid Dep. at 63-64; Fromowitz Aff. ¶ 30.)  NRI considers its pricing methods confidential.  (Magid Dep. at 64.)

---

[9]  Potential clients sometimes quote pricing from competitors as part of the negotiation process.  (Magid Dep. at 40-41.)  The competitor is not disclosed on every occasion.  (Id. at 43-44.)  On rare occasions, NRI has been shown written information or pricing from competitors and, at times, this information has been maintained in NRI's files.  (Id. at 40-41.) Clients generally will divulge what competing company they are using if asked.  (Teti Dep. at 36-37.)

Strom was "very involved in setting pricing and determining pricing methods for customers . . . in his region." (Id. at 63-64.)  As District Manager, Strom "bless[ed] the pricing" to make sure the job was a profitable job before giving it to a customer, although this was the job of account executives and sales managers on a day-to-day basis.  (Fromowitz Dep. at 233-35.)

Strom, moreover, as discussed supra, had access to NRI's Sales Analysis Reports for his region, which are password-protected and display pricing for each customer.  (Id. at 55; Magid Dep. at 68-69.)  From this analysis, Strom had access to view the revenue information for customers in the region, and to perform estimates.  (Magid Dep. at 68-69; Strom Dep. at 78-79.) Strom also had access to NRI's sizeable price book, listing companywide prices for each service, and referred to as "War and Peace" because of its size.  (Strom Dep. at 78-79.)  Strom returned the pricing book prior to his departure from NRI.  (Id.) Strom also was on the distribution list for minutes of the Sales Committee meetings, which discussed pricing, although he was not a member of that committee.  (Fromowitz Dep. at 263; Strom Dep. at 77.)

### 4.  Monthly Gross Profit Reports

Strom had access to NRI's confidential monthly Gross Profit Report ("GPR"), which reflects the financial measures of NRI's performance and costs.  (Fromowitz Dep. at 52.)  The GPRs list,

16

<u>inter</u> <u>alia</u>, the overall monthly profit margins of the company and each individual branch. (<u>Id.</u>; Strom Dep. at 67-68.)  Each GPR, approximately 200 pages long, also lists the costs of goods sold, broken down into various factors.  (Fromowitz. Dep. at 110-15.) The data is shown separately for each branch, and further broken down into separate reports for the specific business performed by the branch, such as CAD graphics (wide-format blueprinting), digital work, and facilities management.  (<u>Id.</u>)  The sales attachment to the GPR is shown by product code, not by customer. (<u>Id.</u> at 132.)  The report enabled its recipients to determine the profitability and financial situation of the overall company, as well as each region of NRI's business.

### 5.    Facilities Management Information

NRI's facilities management division over the past five years has been a high performing division, and a frequent topic of conversation at SBP meetings.  (Fromowitz Aff. ¶ 44.)  NRI currently has over 100 facilities management placements.  (<u>Id.</u> ¶ 3.)  Facilities management arrangements, including the package of services and prices, are unique and confidential.  (<u>Id.</u> ¶ 45.) Strom is aware of the strategies and has acknowledged they are confidential.  (Strom Dep. at 110-14.)

### 6.   Operations Manual

Upon his hiring, Strom was given access to NRI's Operations Manual, which NRI asserts is a confidential document detailing

procedures based on company practices developed over its lifetime.  (Fromowitz Aff. ¶ 5.)  The document is password-protected, and access is limited to manager level and above. (Magid Dep. at 149.)  All employees of NRI who have access to this manual have signed confidentiality agreements.  (<u>Id.</u>)  Strom contends he did not access the manual during his tenure at NRI. (Strom Dep. at 51-52.)

### 7.  Equipment

Strom's job at NRI included making decisions about the equipment and machinery in his region.  (<u>Id.</u>, at 72-74.)  He made decisions as to the purchase, use, and location of the equipment.  (<u>Id.</u>)

### 8.  Production Committee

Strom was a member of NRI's Production committee.  (<u>Id.</u> at 78; Magid. Dep. at 124-25.)  The committee, which met bi-weekly and discussed production-related issues common to all locations, is composed of the Vice President of Production, the District Managers, and the Branch Managers.  (Magid. Dep. at 124-25.) Topics discussed at the production meetings include allocation, relocation, experiences, performance issues and problems, best practices, upcoming jobs, equipment, and software applications that may benefit the business.  (Fromowitz Dep. at 53-54, 138-40.)  Minutes from the meeting are marked confidential and have limited access for distribution.  (<u>Id.</u> at 139.)

18

### 9.   Recruitment Reports

Throughout his employment, Strom also received NRI's recruitment reports, showing the staffing and personnel needs of the company.  (Strom Dep. at 82-83.)

### 10.  Training

Strom attended various training sessions while employed by NRI.  (Magid Dep. at 61-62.)[10]  Strom attended a two-day offsite session for senior managers and executives in its quality improvement process.  (Id.; Strom Dep. at 55-56.)  NRI indicates that the process, referred to as "QES," is taught to all employees, and that, to the best of its knowledge, QES is not a process that any other competitor has implemented.  (Fromowitz Dep. at 52-53, 120-21.)  NRI considers this process confidential.  (Id. at 53.)

Strom also attended offsite meetings with executives from other companies.  (Magid Dep. at 61-63.)  Strom attended an all-expense paid Repromax conference in Hawaii, as well as an International Reprographics Association ("IRGA") conference.  (Strom Dep. at 58-59, 96-97.)  Strom stated such conferences are similar to "fair[s]."  (Id. at 59.)  He obtained his knowledge of

_____

[10]   Strom and NRI dispute the meaning of "training."  While NRI asserts Strom attended various training sessions, Strom indicated that he did not receive any training at NRI, although admits to attending the meetings NRI refers to as training.  (Strom Dep. at 53-54.)

the different types of 3-D equipment at the IRGA convention, but
stated that technologies such as 3-D imaging and color management
were "not new things that [he] would consider [having been
trained in]." (Id. at 57.)

While at NRI, Strom learned, and used extensively, the
company's internally developed proprietary software called
Reprotrack. (Id. at 52-54; Fromowitz Aff. ¶ 27.) The software
includes a job tracking and billing tool which "ties production
and administration of the business together and is a key
differentiator of NRI from its competitors." (Fromowitz Aff. ¶
27.) He also learned NRI's operational procedures, including
NRI's approximately 1,200 pricing codes. (Magid Dep. at 63.)

### III. NRI's Acquisition of Triangle Blueprint Company

NRI, on October 1, 2007, acquired the assets of Triangle
Blueprint Company ("Triangle"), a family owned business established
in 1939 in New Jersey. (Magid Aff. ¶ 8; Teti Dep. at 9.) NRI
spent a substantial sum on the purchase. (Magid Aff. ¶ 6.)
Triangle has provided reprographics services to the AEC industry
for over 50 years. (Compl. at 5; Teti Dep. at 9-10.) The
Triangle operations consist of three locations in New Jersey: (1)
Princeton Pike ("PP") in Lawrenceville; (2) Lawrence Road ("LR")
in Lawrenceville; and (3) Pennington Square ("PS") in Pennington.

(Fromowitz Dep. at 154-56; Teti Dep. at 18-19 .)[11]  The PP
location provides reprographics services to the AEC industry, as
well as small and wide format color and black-and-white printing,
small and wide format scan-to-file, scan-to-print, color digital
printing, finishing, and offset printing.  (Fromowitz Dep. at
162-63.)  The LR and PS locations are primarily walk-in copy
centers, and do not service the AEC industry.  (Fromowitz Dep. at
156-57; Teti Dep. at 18-19 .)  Prior to the acquisition, in 2007,
a majority of Triangle's revenues were generated by reprographics
services to the AEC industry.  (Teti Dep. at 17-18.)
Approximately 25 percent of Triangle's customers are in the AEC
field, coming from Mercer, Middlesex, Somerset, Monmouth, Ocean,
Burlington, and Hunterdon counties in New Jersey, and Bucks
County in Pennsylvania.  (Id. at 28-29.)  The majority of
Triangle's remaining customers are involved in the pharmaceutical
industry.  (Id. at 23-24.)

    Upon acquisition, NRI contracted with Triangle's principals
to continue in management positions during the integration of
Triangle's operations.  (Magid Aff. ¶ 6.)  Joseph Teti,
Triangle's former president, who has 40 years of experience in
the reprographics industry in New Jersey, was appointed District

---

[11]  When NRI acquired Triangle, the LR office was located at
Darrah Lane.  (Fromowitz Dep. at 186-87; Teti Dep. at 19.)

Manager for NRI's New Jersey region.  (Dkt. entry no. 23, Pl.
Reply Br. at 12.)

NRI purchased Triangle, a well-known reprographics company
in the New Jersey area, for, <u>inter alia</u>, its broad customer base
and relationships in the New Jersey and Philadelphia metropolitan
areas.  (Compl. at 5; Magid Aff. ¶ 9; Pl. Reply Br. at 17.)  NRI
has invested significant sums integrating the operation into its
business.  (Compl. at 5.)  Since purchasing Triangle in October
2007, NRI has invested additional money to purchase and lease new
reprographics equipment to expand and improve its services to its
customer base.  (Magid Aff. ¶ 8.)  NRI has also spent
considerable sums to implement NRI's policies and procedures to
further develop the Triangle territory, as well as build
Triangle's color digital business, which NRI feels is crucial
given the market Triangle serves.  (Fromowitz Aff. ¶ 20;
Fromowitz Dep. at 59-61.)  The purchase of Triangle was the
largest acquisition that NRI has made to date, and a
strategically significant move for the company.  (Magid Dep. at
129-30.)  Thus, maintaining and developing Triangle's sales
territory and customer base is important to NRI.

The decision to acquire Triangle was made by NRI's Chief
Executive Officer and his father, who has long been involved in
building the company.  (Magid Dep. at 103.)  Strom was informed
of the acquisition with the rest of the company upon its

completion.  (Compl. at 5; Fromowitz Aff. ¶ 22.)  At the October 2007 and January 2008 SBP meetings, the goals and strategies for Triangle were discussed, including the color business and how to better capitalize on Triangle's capabilities and customer base. (Magid Dep. at 104-05.)

Such conversations continued at the March 2008 SBP meeting, which went deeper into the specifics of NRI's objectives regarding Triangle and the need to make the Triangle business, which is not currently profitable, profitable. (Fromowitz Dep. at 184-91, 202-05; Magid Dep. at 106-07.)  At the March 2008 SBP meeting, Teti made a detailed presentation to the committee. (Compl. at 5.)  Teti provided each member with a copy of the strategic plan for New Jersey, which included goals for growing the color business, utilizing specific personnel, equipment and software investments, marketing costs, application development, and employees.  (Id.; Fromowitz Dep. at 90-91, 179-80, 184-91; Magid Dep., at 130.)[12]  Teti also discussed ways to differentiate NRI from its competition and increase value for NRI's customers in the market.  (Fromowitz Dep. at 87-88.)

---

[12]     Strom stated that he recalls a presentation by Teti at the March 2008 SBP meeting, and thought Teti might have spoken about a piece of equipment, but that he could not recall the details of the discussion.  (Strom Dep. at 119-22.)  He suggested that perhaps he was in the restroom during this presentation. (Id.)

A main objective of NRI is to increase the profit margin of the Triangle businesses and raise prices through specific mechanisms.  (Fromowitz. Aff. ¶ 24.)  One way NRI plans to accomplish this goal, for example, is by expanding the color digital business, and it has been actively researching and developing specific software applications for this purpose. (Fromowitz Dep. at 59-61, 68.)  NRI plans to enable its color business customers to provide information by way of the internet, eliminating geographic barriers, and allowing NRI to electronically produce the product to send to the customer.  (Id. at 59-61.)  NRI has already invested in equipment for the venture, which was discussed at the March 2008 SBP meeting.  (Id. at 67.)  The SBP was provided a list of customers in every city that NRI plans to target with this service.  (Id. at 61-62.)[13]

At the time of the acquisition, none of Triangle's approximately 50 employees had non-competition clauses in their employment contracts.  (Magid Dep. at 70.)  Approximately six of

---

[13]    This enhanced color digital service is not currently a service provided by FLMR or FLMG.  (Fromowitz Dep. at 62.)  NRI indicates that, to the best of its knowledge, Mimeographics.com is the only company that provides such a service.  (Id.)  One-on-one marketing, referred to as variable data printing, is within this developing strategic focus discussed at the March SBP meeting, as well as outdoor color graphics. (Id. at 73-76.)

the employees retained by NRI, including Teti, currently have
such clauses in their contracts.  (Id.)[14]

        During his employment with NRI, Strom held no responsibility
for NRI's New Jersey branches.  (Def. Br. at 3.)

## IV.  Strom Enters into Discussions with FLMG

        Strom's son has been employed by FLMG, and subsequently
FLMR, for approximately two to three years.  (Strom Dep. at 124;
Misischia Dep. at 99.)  Through that connection, Strom, in
December 2007, received a phone call from Frank Misischia of FLMG
to discuss potential employment opportunities for Strom.  (Strom
Dep. at 104-05; Misischia Dep. at 100-02.)[15]  Strom had no
contact with Misischia prior to this time.  (Strom Dep. at 123.)
Strom, who had resided in Maryland since 2005, claims he was

--------

[14]  In addition to Teti, employees with non-competition
contracts include persons at the level of sales managers and
individual account executives.  (Magid Dep. at 70.)  The
remaining employees without non-competition clauses include the
branch manager, the MIS person, the accounting department,
maintenance staff, drivers, and production workers.  (Id.)

[15]  Misischia is a member of the family that owns FLMG and
FLMR; both of his parents have top positions in the ownership and
management of the companies. (Misischia Dep. at 11-14.)  He is an
attorney admitted in New Jersey who practiced in commercial
litigation with a major law firm for approximately one and a half
years before joining FLMG in 2007. (Id. at 6-9.)  He is the
current Director of Client Services and General Counsel of FLMR.
(Id. at 100-02.)  At the time the discussions between Misischia
and Strom commenced, FLMG still encompassed the reprographics
business.  FLMR was not created until April 1, 2008.  See infra
I.C.

willing to enter into discussions with Misischia because of his
desire to return to his home state of New Jersey and be closer to
his children, grandson born in January 2007, and elderly father.
(Def. Br. at 2; Strom Dep. at 125, 129-30, 170-71.)   After
communicating via electronic mail and on the telephone, on
February 1, 2008, Strom met with Misischia at FLMG's Fairfield
office, and was told about a potential opportunity to work for
FLMG in Atlantic City, New Jersey.   (Strom Dep. at 104-05, 129-
30, 132-33; Misischia Dep. at 106, 125.)   FLMG was considering
acquisition of an office in that area, and, from what Misischia
had heard about Strom, thought Strom would be a capable person to
run the new location.   (Strom Dep. at 104-05, 129-33; Misischia
Dep. at 125, 132-33.)   Strom and Misischia decided that they
would "continue to talk . . . to see if there was a way [Strom]
would fit into the [FLMG] organization."   (Strom Dep. at 131.)

Strom and Misischia met again on February 13, 2008 in
Atlantic City, where, along with other FLMG representatives, they
visited the reprographics business FLMG was looking to acquire,
which at the time was a Triangle franchise. (Misischia Dep. at
135-36.)   The purpose of the visit was to evaluate its potential
acquisition for FLMG, and to determine if Strom would be
interested in working there.   (Pl. Reply Br. at 23; Misischia
Dep. at 137-38.)   During the course of the visit, Strom commented
that the equipment at the Atlantic City store appeared to be very

old and would need renovations.  (Strom Dep. at 134-38.)

Misischia notified Strom through e-mail on March 13, 2008 that ARC, Strom's former employer, rather than FLMG, would purchase the Atlantic City store, and asked Strom for his thoughts. (Id. at 141-45; Misischia Dep. at 168-69.)  Strom's response on this subject to Misischia included comments that:

> The quick thought would be to insure [sic] that the staff at triangle does not sign any non-compete with ARC.  This may be the first move to tie up the existing staff.  Aside from the positive they would bring to FLM, it would certainly be a blow to ARC if they leave.  I'm sure they will throw some cash around, it's their M.O. They will also use the threat to sign if they want to keep their jobs.

(Dkt. entry no. 19, Misischia Dep. Ex. 2, at 23.)  Misischia conceded that this advice was received from Strom while he was employed at NRI.  (Misischia Dep. at 177-78.)  Misischia and Strom continued to send e-mail communications, with Misischia promising to keep Strom updated.  (Misischia Dep. Ex. 2, at 26.)

On March 31, 2008, Strom received another e-mail from Misischia stating:

> [W]e view you as a key guy to growing our repro business.  I think at this point, while we are all desperately wanting AC to happen and hopefully it will, our focus is also on not missing an opportunity to bring you on board. . . . I'm going to take a longer look at your noncompete to see what your options are if, in fact, AC isn't happening.

(Id. at 31.)  Strom contends that this is the first indication he received that FLMG might have a place for him outside of Atlantic City.  (Strom Dep. at 154-56.)  Misischia contends FLMG wanted

27

Strom because the manager of the Princeton office had not been performing well, and Strom's reprographics experience would be an asset. (Misischia Dep. at 140-42.)  Strom's discussions and meetings with FLMG, and subsequently FLMR, were taking place at a time when NRI had recently acquired its New Jersey branches, and Strom was in attendance at meetings where NRI's strategy to compete in New Jersey was planned and discussed.

Strom, Misischia, and FLMG's President met in central New Jersey to discuss opportunities for Strom at what had now become FLMR in Princeton on April 25, 2008.  (Id. at 145-46.)  After this date, FLMR definitively decided to reassign its manager located in Princeton, and the conversations between Strom and FLMR intensified.  (Id. at 146-47.)  On one particular occasion, Misischia and Strom discussed NRI's experience, or lack of experience, with a particular piece of equipment FLMR was considering purchasing.  (Id. at 211-18.)

**V.   FLMR Offers Strom Director of Operations Position**

After additional e-mail communications, and at least one additional meeting between the parties in June 2008, FLMR made Strom a "formal" employment offer in July 2008 to become its Director of Operations.  (Id. at 148.)  FLMR had been aware that

Strom had executed an Agreement with NRI containing a non-competition clause since approximately February 2008.  (Id.)[16]

Defendants assert that as Director of Operations, Strom's primary responsibility would be to manage the day-to-day operations of the Princeton office, and that he would have no responsibility for the overall business, strategic planning, sales, or client contact.  (Strom Certif. ¶ 27; dkt. entry no. 13, Ex. B, Misischia Certif. ¶ 7.)  Strom's job description, however, shows that Strom's intended job encompassed much more than merely managing the operations of one office.  The plan was in reality for Strom to hold a high level of responsibility for the entire FLMR business in New Jersey, including strategic business planning.

Strom was sent a three-page job proposal, including a job description of the Director of Operations position, on July 2, 2008.  (Strom Dep. at 158-59.)  The position description stated: "The Director of Operations, General Manager for [FLMR] assumes primary responsibility for the effective management of all operations, business planning and growth for [FLMR], which includes its Fairfield, NJ and Princeton, NJ, operations."  (Misischia Dep., Ex 2, at 53.)  The responsibilities for the position include, inter alia:

_____

[16]  It is FLMR's position, upon advice of counsel received at the time, that Strom's employment with FLMR is not a violation of his Agreement with NRI.  (Misischia Dep. at 152-54.)

Overall management with top and bottom-line
responsibility for all operations and business services
at [FLMR]'s Fairfield, NJ and Princeton, NJ, locations.
Includes AEC reprographics, digital printing and
duplicating, Trucolor (large format, in Princeton only),
and related data/document management services.

Lead the planning process for implementing a total
workflow solution for [FLMR] in both Fairfield, NJ and
Princeton, NJ. This is a soup-to-nuts plan for
equipment (hardware), systems (software), and personnel,
as well as a plan to define how different departments
within [FLMR] will interact. Work with corporate
management to refine, approve and implement the plan.

Lead the planning process for implementing a business
development plan, including a sales plan, and related
budgets to develop and market the division's product-
services. Work with corporate management to refine,
approve and implement plan.

Identify key areas where [FLMR] can increase efficiency
and quality control, while also identifying areas where
costs can be cut.

Identify key new targets for our existing
products/services and work with corporate management to
develop a strategy to capture this additional business.
Identify products/services that [FLMR] should, but does
not currently offer its customers, and share your vision
with corporate management to develop a strategy to
capture new customers and new business from our existing
client base.

. . .

Ensure a high degree of cost-productivity and
achievement of defined targets for growth and
profitability.

(Id. at 53-54.) Strom was offered an annual salary of $115,000

to fill this position. (Id. at 55; Strom Certif. ¶ 10.)

Strom contends that, after receiving the formal offer, he

reiterated to Misischia that he was a production oriented person,

rather than a technical employee or salesperson.  (Id.)  Strom received a revised version on July 18, 2008, in which the compensation plan was slightly changed.  (Strom Dep. at 160-61.) The job description was not altered in any way. (Id.)

## VI.   Strom Terminates Employment with NRI

In August 2008, Strom voluntarily terminated his employment with NRI to take the job as Director of Operations for FLMR. (Strom Certif. ¶¶ 22, 27; Strom Dep. at 179.)  Strom provided NRI with three weeks advanced notice of his resignation.  (Def. Br. at 4.)  Blaise Nealon was hired by NRI to replace Strom as its District Manager for the District of Columbia region.  (Id.) Strom planned to begin employment at FLMR, working at the FLMR Princeton location, less than seven miles from Triangle's PP branch office, on August 11, 2008.  (Pl. Reply Br. at 18.)

Marc Fromowitz, Director of Administration for NRI, met with Strom upon receiving notice of his resignation. (Fromowitz Aff. ¶ 34.)  Fromowitz asserts that he informed Strom he would be in violation of the Agreement if he went to work for its competitor in New Jersey, to which Strom responded "Yes, I am aware of that." (Id. ¶¶ 34, 35.)  Fromowitz further informed Strom that NRI would pursue legal action if such an event occurred.  (Id. ¶ 34.)  Strom was also informed by NRI's Chief Executive Officer that working for the competitor would violate the Agreement. (Id. ¶ 36.)

31

Strom's last day of employment at NRI was August 7, 2008.
(Compl. at 6.)  On that morning, NRI hand delivered to Strom a
letter describing Strom's obligations under the Agreement and
confirming that joining FLMR would violate the Agreement.  (Id.)
FLMG was sent a copy of the letter and thereby formally placed on
notice that NRI intended to enforce the non-competition agreement
that had been signed by Strom in 2005.  (Id. at 6-7.)  During
that afternoon, Strom met with two NRI representatives for an
exit interview.  (Id. at 6.)  Strom confirmed his plans to start
with FLMR on August 11, 2008.  (Id.)  Prior to resigning, Strom
did not approach anyone at NRI to discuss career opportunities
with NRI in New Jersey.  (Fromowitz Aff. ¶ 32.)  NRI asserts that
had Strom done so, he would still be employed by NRI.  (Id.)[17]
Strom asserts he would not have signed the Agreement if NRI had
any New Jersey branches at the time of signing, or if he could
have foreseen that the Agreement would prevent him from returning
to employment in this field in New Jersey.  (Strom Certif. ¶ 7;
Strom Dep. at 37-38.)

---

[17]  Although Fromowitz testified that Strom would not have
been considered for the sales manager position because he does
not have "the capacity or understanding of that marketplace to be
considered a sales leader for the market," and that Strom was not
familiar with the color digital business, he noted that had Strom
inquired about a transfer to New Jersey "he would have been told
that Mr. Teti's contract is going to be expiring in very short
order and [NRI] would love to have somebody with [his] skills and
ability to turn this failing branch around." (Fromowitz Dep. at
231-233, 253-56.)

## CONCLUSIONS OF LAW

The Court has jurisdiction over this controversy pursuant to 28 U.S.C. § 1332.  NRI seeks to enforce the non-competition clause contained in the Agreement signed by Strom upon his employment at NRI in 2005, and to enjoin FLMR, a competing reprographics firm that falls within a 50-mile radius of NRI's offices, from employing Strom.  The Court finds that NRI has satisfied the elements of a preliminary injunction such that its requested relief is warranted.[18]  The findings and conclusions set forth in this opinion are preliminary only, based upon the state of the record at this stage in the litigation.  <u>See</u> Fed.R.Civ.P. 65(a).  The parties have preserved all rights to present their disputes to a fact-finder for eventual adjudication on the merits.[19]

----

[18]     To the extent the "Conclusions of Law" portion of this memorandum opinion contains findings of fact in addition to those expressly set out under the heading "Background-Factual Findings," they shall be deemed to be part of the findings of fact.

The "Conclusions of Law" subsections of this memorandum opinion generally do not contain citations to the evidence except after quoted language.  The record citations are set forth in the "Background-Factual Findings" section of this memorandum opinion.

[19]     NRI and Strom indicated a desire to waive the right to jury trial in the 2005 Agreement, which states: "Any dispute or controversy arising out of or related to this Agreement or the breach thereof shall be determined by a court of competent jurisdiction without a jury, the parties having by this Agreement expressly waived any right to a jury trial." (Agreement ¶ 9.)

Injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." Novartis Consumer Health v. Johnson & Johnson-Merck Consumer Pharms. Co., 290 F.3d 578, 586 (3d Cir. 2002) (quotation and citation omitted). To obtain such interim relief, a movant must demonstrate both a likelihood of success on the merits and the probability of irreparable harm absent the injunction. Frank's GMC Truck Ctr. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988). Thus, in determining whether to issue a preliminary injunction, the Court must consider whether: (1) the movant has shown a reasonable probability of success on the merits; (2) the movant will be irreparably injured by denial of the relief; (3) granting the preliminary relief will result in even greater harm to the nonmoving party; and (4) granting the preliminary relief is in the public interest. BP Chems. Ltd. Formosa Chem. & Fibre Corp., 229 F.3d 254, 263 (3d Cir. 2000); ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1477 n.2 (3d Cir. 1996); see The Nutrasweet Co. v. Vit-Mar Enter., 176 F.3d 151, 153 (3d Cir. 1999). The Court should issue an injunction "only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." AT&T Co. v. Winback & Conserve Program, 42 F.3d 1421, 1427 (3d Cir. 1994) (citation omitted); see The Nutrasweet Co., 176 F.3d at 153

34

(noting that a movant's failure to establish any one of the four elements renders a preliminary injunction inappropriate).

**I.    Reasonable Probability of Success on the Merits**

The party seeking a preliminary injunction must demonstrate a "reasonable probability of eventual success in the litigation." Bennington Foods LLC v. St. Croix Renaissance, Group, LLP, 528 F.3d 176, 179 (3d Cir. 2008).  In evaluating whether a movant has satisfied this first part of the preliminary injunction standard, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that it will prevail on the merits." Oburn v. Shapp, 521 F.2d 142, 148 (3d Cir. 1975).

The Court here must examine the likelihood of NRI's success in showing it has a reasonable probability of success against defendants on its claim for breach of contract.  Under New Jersey law, the following elements are necessary in a breach of contract claim: (1) a contract; (2) a breach of that contract; (3) damages flowing therefrom; and (4) plaintiff performed its own contractual duties.  Hutchinson v. Del. Sav. Bank FSB, 410 F.Supp.2d 374, 385 n.21 (D.N.J. 2006).[20]

---

[20] New Jersey contract law will be applied to this case. New Jersey is the forum state.  The law of the forum state shall apply unless there is an objection.  There have been no such objections.  (See Pl. Reply Br. at 1-2.)

Here, a contract exists signed by NRI and Strom containing a specific clause restricting Strom's employment upon leaving NRI. NRI argues that Strom's employment with FLMR will breach the non-competition clause of the contract.  (Pl. Br. at 2.)  Defendants concede that Strom's employment with FLMR will be within a 50-mile radius of NRI.  (Misischia Dep. at 155-58.)  Defendants, however, argue that NRI will be unable to make a prima facie showing of success on the breach of contract claim, as the non-competition clause should not be enforced because it is ambiguous, unreasonable in geographic scope, and does not pertain to a protectable interest of NRI.  (Def. Br. at 9.)

A post-employment restrictive covenant is enforceable if the terms of the covenant are reasonable in light of the totality of the circumstances.  Solari Indus. v. Malady, 264 A.2d 53, 56 (N.J. 1970); Platinum Mgmt. v. Dahms, 666 A.2d 1028, 1038 (N.J. Super. Ct. 1995).  The restrictive covenant must: (1) be reasonably necessary to protect the employer's legitimate business interests; (2) not cause undue hardship to the employee; and (3) not impair the public interest.  Solari Indus., 264 A.2d at 56; Ingersoll-Rand Co. v. Ciavatta, 542 A.2d 879, 888-89 (N.J. 1988).  Furthermore, a post-employment covenant will not be enforced beyond the geographical area and time period needed to protect the employer's practice.  Karlin v. Weinberg, 390 A.2d 1161, 1169 (N.J. 1978).  "Even if a covenant is found

36

enforceable, it may be limited in its application concerning its geographical area, its period of enforceability, and its scope of activity." <u>Coskey's Television & Radio Sales & Serv. v. Foti</u>, 602 A.2d 789, 793 (N.J. App. Div. 1992).

**A.   The Non-Competition Clause Pertains to All NRI Branches in Existence at the Time of Strom's Termination**

Defendants argue that Strom will not breach the contract by working at FLMR in New Jersey because when Strom signed the Agreement, NRI did not have any branches in New Jersey.  (Def. Br. at 9.)  Defendants argue that Strom did not intend, nor did the agreement provide, that the non-competition provision would apply to NRI branches opened after the date of execution.  (<u>Id.</u> at 10.)  Furthermore, defendants argue that the non-competition provision in the Agreement is ambiguous as it states that Strom is restricted from being employed by a competing firm "within a fifty (50) mile radius of any NRI branch," but fails to specify whether future acquired branches are included.  (<u>Id.</u>)

Paragraph 6 of the Agreement provides:

> 6.  For a period of one (1) year from the termination, for any reason, of my employment with NRI, <u>I will not, within a fifty (50) mile radius of any NRI branch</u>, directly or indirectly, own (as a sole proprietor, partner, member, shareholder, officer, director or otherwise) manage, operate, join, control, aid, be employed by or participate in the management, operation or control of, or be connected in any manner or capacity, with any person or entity <u>engaged in reprographics and/or digital imaging business of the type or character conducted by the Company at the time of such termination or that shall then have been in active development.</u>

37

(Agreement ¶ 6 (emphasis added).)

When interpreting contractual provisions, "fundamental canons of contract construction require that a court examine the plain language of the contract and the parties' intent, as evidenced by the contract's purpose and surrounding circumstances." Highland Lakes Country Club & Cmty. Ass'n v. Franzino, 892 A.2d 646, 656 (N.J. 2006). A court generally considers the contractual terms, the surrounding circumstances, and the purpose of the contract. Id. Under the basic rules of contract construction, a document must be read as a whole "in accord with justice and common sense." Krosnowski v. Krosnowski & Garford Trucking, 126 A.2d 182, 188 (N.J. 1956); Cumberland County Improvement Auth. v. GSP Recycling Co., 818 A.2d 431, 438 (N.J. App. Div. 2003). The contract should not be interpreted to render one of its terms meaningless. Cumberland County Improvement Auth., 818 A.2d at 438.

The Court finds that a plain reading of the non-competition clause in the Agreement provides that the geographic restriction does in fact apply to branches acquired after execution of the Agreement, and that it is not ambiguous. Paragraph 6 of the Agreement makes reference to competitors that are engaged in NRI's business "at the time of such termination." When the provision is read as a whole, the phrase "at the time of such termination" unambiguously defines the meaning of "any branch."

38

The phrase makes clear that the provision stands for any branch
in existence at the time Strom's employment is terminated.

Furthermore, NRI's intent when executing this Agreement was
to keep its competitors from learning its proprietary secrets and
confidential information.  It does not make sense that NRI would
intend the Agreement to apply only to competitors in August 2005.
The Court thus finds that Strom's employment with FLMR will
breach the non-competition clause of the contract if the clause
is found to be enforceable under the circumstances.  The Court
will next discuss the reasonableness of the contract provision to
determine enforceability.

**B.    The Geographic Limitation is Not Unreasonably Broad**

Defendants contend that NRI will not succeed on the merits
of the case because the non-competition provision's 50-mile
radius is unreasonably broad.  (Def. Br. at 11.)  Defendants
assert that "a reprographics branch can generally provide
services to clients that are within approximately a 20-30 mile
radius."  (Id.)  NRI has stated that the 50-mile radius
restriction for high-level employees is necessary because of the
location of NRI's competitors in relation to its customer base
and the employees' exposure to confidential business information.
(Pl. Reply Br. at 11.)

The geographic scope of a non-competition provision must be
"narrowly tailored to ensure the [provision] is no broader than

39

necessary to protect the employer's interests."  Cmty. Hosp.
Group v. More, 869 A.2d 884, 897 (N.J. 2005).  "[T]he
reasonableness of the [geographic scope] of the agreement must be
analyzed in view of the specific facts presented in each case."
Manhattan Assocs. v. Ruderman, No. 05-3928, 2005 U.S. Dist. LEXIS
45132, at *10 (D.N.J. Sept. 20, 2005).  Strom is planning to
become Director of Operations for FLMR based out of FLMR's
Princeton branch.  The FLMR Princeton office is less than seven
miles from NRI's PP branch office.  Both FLMR and NRI's PP branch
offer similar services and compete for customers in the AEC
industry.  Teti testified that the geographic reach of Triangle's
customers in 2007 included Mercer, Monmouth, Ocean, Burlington,
and Hunterdon counties in New Jersey, and Bucks County in
Pennsylvania.  NRI's New Jersey branches now maintain a delivery
zone that covers at least a 40-mile radius from the PP office.
(Pl. Reply Br. at 12.) Under the circumstances presented, the
Court cannot conclude that this provision is unreasonably broad
insofar as it prohibits Strom from employment seven miles from a
branch office.

In addition, NRI's New York City offices are within 42 miles
of FLMR's Princeton office and only 19 miles from NRI's Fairfield
office.  FLMR retained Strom to oversee all of FLMR's
"operations, business planning and growth" in both Princeton and
Fairfield.  There was no one at his level in the Fairfield

office.  Given that Strom was privy to sensitive corporate
strategic secrets while employed in a high-level position at NRI
for three years, restricting employment within 19 miles from
NRI's New York offices, in existence at the time the Agreement
was signed, is not unreasonable.  See Campbell Soup Co. v.
Desatnick, 58 F.Supp.2d 477, 485 (D.N.J. 1999); cf. Hudson Foam
Latex Prods. v. Aiken, 198 A.2d 136, 141 (N.J. App. Div. 1967)
(holding contract provision prohibiting employee from working for
employer engaged in similar business unenforceable without
geographic limitation).

Misischia, moreover, stated that reprographics customers can
generally service customers only within a 30-minute drive from a
branch, and asserts that FLMR "typically" does not service
customers outside of a 20-mile radius.  (Misischia Dep. at 48-
50; Def. Br. at 21.)[21]  Strom indicated that NRI's customers are
located within approximately 25 miles of NRI's District of
Columbia branches, and specifically recalled that one customer is
approximately 23 or 28 miles from an NRI branch.  (Strom Dep. at

---

[21]  Michael Bartow, president of Hudson Reprographics, an
ARC division based out of Irvington, New Jersey, has certified
that his company requires non-competition agreements for its
officers and salespersons limited to prohibiting work within a
30-mile radius of its location.  (Dkt. entry no. 13, Ex. C,
Bartow Certif. ¶ 6.)
Misischia admits FLMR has certain customers outside that are
outside of a 25-mile radius.  (Misischia Dep. at 91-92.)  It also
services customers in New York City at times.  (Id.)

80-82.)[22]  Furthermore, Defendants argue that NRI reduced the
geographic reach of its non-competition clauses for its account
executives within the last year from a 50-mile radius to 25-mile
radius, and the four salespersons at the NRI New Jersey branches
have non-competition clauses within only a 25-mile radius.  (Def.
Br. at 11; Strom Certif. ¶ 21.)

      Assuming arguendo that a reprographics branch can serve
customers within a 25-mile radius, if two competing companies
have locations that are 50 miles apart, the competitors' 25-mile
reach would not invade each other's customer base.  This suggests
that the 50-mile geographic radius is not unreasonable because it
protects the company's 25-mile reach.  Moreover, assuming
arguendo that the non-competition clause was restricted to a
geographic scope of a 25-mile radius, such a scope would still
encompass 50 miles once a circle was drawn from the 25-mile
radius.  NRI's New Jersey and New York City offices would still
fall within this scope preventing Strom from employment with
FLMR.

      It should be noted that all parties have acknowledged that
technology in the industry is becoming more advanced, and the
Court notes that technological advances are a factor that could

_____

      [22]  Douglas Magid, Chief Executive Officer of NRI, stated
the farthest client NRI services in the District of Columbia
region is approximately 45 miles from one of the branches, and
the average customer is 10 miles away.  (Magid Dep. at 51-52.)

increasingly affect the reasonableness of geographic limitations.
For example, NRI explained it receives many orders
electronically, and described its digital services initiatives
for New Jersey that would effectively eliminate geographic
restrictions for customers.  (Magid Dep. at 49.)  Teti testified
that "internet [i]s making it possible to do business anywhere
and mileage [does not] matter as much," and Strom noted the
technological advancements during his deposition.  (Teti Dep. at
15; Strom Dep. at 68-70.)  See Victaulic Co. v. Tieman, 499 F.3d
277, 237 (3d Cir. 2007) ("In this Information Age, a per se rule
against broad geographic restrictions would seem hopelessly
antiquated.")  The Court finds, given current technology and the
set of facts presented, the geographic scope of Strom's non-
competition clause is not unreasonably broad.

**C.   NRI has a Legitimate Interest in Enforcing the Non-
        Competition Clause**

Defendants contend that NRI does not have a legitimate
interest in enforcing the non-competition clause contained in the
Agreement because "there is nothing unique to any company in the
reprographics industry," and all companies perform the same
services, through the same methods, with the same equipment.
(Strom Dep. at 33-35, 59-60; Misischia Dep. at 54-55.)  Strom
noted this is a "very simplified" service driven industry, and
stated, through his employment at NRI, he did not learn anything
about NRI that is not known throughout the industry or develop

43

any specialized skills.  (Strom Certif. ¶¶ 13, 14; Strom Dep. at 59-60.)[23]  Defendants argue, as such, Strom possesses no proprietary secrets or confidential information of NRI that he could use while performing his duties at FLMR.  As noted supra, however, the record reveals that during his tenure at NRI, Strom was exposed to a considerable amount of potentially sensitive competitive information that is entitled to protection under New Jersey law.

Employers have a right to contractually protect their confidential information.  Ingersoll-Rand Co., 542 A.2d at 892-93; Whitmyer Bros. v. Doyle, 274 A.2d 577, 581 (N.J. 1971).  Confidential information is protectable when it is unique and not generally known throughout the industry.  Ingersoll-Rand Co., 542 A.2d at 889.  Information is not protectable when it is merely the knowledge, skill, or expertise learned or developed over an employee's career or tenure with the employer.  Id. at 889.  Where an employer's interests do not rise to the level of a proprietary interest deserving of judicial protection, a court will conclude that a restrictive agreement merely stifles competition and therefore is unenforceable.  Id. at 892.

To receive judicial protection, however, "information need not rise to the level of the usual trade secret, and indeed, may

---

[23]  FLMR further contends that it regularly speaks to its competitors about equipment and pricing, and asserts that its profit margin is not confidential.  (Misischia Dep. at 55-60.)

otherwise be publicly available.  The key to determining misuse
of the information is the relationship to the parties at the time
of disclosure of the intended use." Platinum Mgmt., 666 A.2d at
1038; see Ingersoll-Rand Co., 542 A.2d at 894 ("[E]mployers may
have legitimate interests in protecting information that is not a
trade secret or proprietary information, but highly specialized,
current information not generally known in the industry, created
and stimulated by the . . . environment furnished by the
employer.")

        The restrictive covenant contained in NRI's employment
contract was designed to protect NRI's proprietary and
confidential information, as well as its relationship with
customers, which are legitimately protectable interests.  See
Ingersoll-Rand Co., 542 A.2d at 889; Platinum Mgmt., 666 A.2d at
1038.  The non-competition clause Strom signed was in recognition
of his unique employee status and the damage he could inflict on
NRI through the misuse of knowledge he had acquired there.  See
Platinum Mgmt., 666 A.2d at 1038.  The knowledge and information
NRI seeks to protect through the Agreement goes beyond the mere
identity of customers or general skills learned in the trade.  It
seeks to protect Strom's knowledge of NRI's marketing plans,
sales projections, product strategies, customer buying habits,
and internal methods to bring profitability to the company.

When Strom joined the staff of NRI in August 2005, he came into a key position that of necessity would expose him to sensitive NRI information.  Strom was privy to high-level confidential discussions of such matters as NRI's strategic planning, financial performance, specific customers, products, services, customer proposals and approaches, revenue trends, marketing plans, and the overall goals and plans of NRI.  Much of the information discussed at the SBPC meetings was more detailed information than that which is disclosed to customers, competitors, or any other publicly available source, and Strom understood that this information was confidential and not to be disclosed outside of NRI.  Strom also had access to NRI's pricing models and strategies, including concepts for deriving additional revenues from customers and the "various and sundry ways" to price, competitive strategies of NRI not publicly known.  See, e.g., id., at 1038 ("A competitor's knowledge of a particular customer's pricing and packaging requirements actually gives the competitor the ability to design for that customer's needs and to obtain an advantage over competitors who do not have this information.").

Strom, whose job description at FLMR, in part, was to "[i]dentify products/services that [FLMR] should, but does not currently offer its customers" was aware of how NRI offers services that FLMR does not, such as NRI's 3-D printing and

46

"color management" services.  (Misischia Dep. Ex. 2, at 53.)
Strom, furthermore, was aware of the NRI's strategies and pricing
regarding facilities management placements, which he admitted was
confidential information, and is a service FLMR emphasizes on its
website.  (See Fromowitz Aff. ¶ 46.)  He also had knowledge of
situations in which customers were dissatisfied with NRI.  All of
the foregoing information is clearly confidential and proprietary
as to NRI, and protectable through a restrictive covenant.  See
Platinum Mgmt., 666 A.2d at 1038 (finding restriction was
reasonable when seeking to protect the information and knowledge
the company utilized to obtain an advantage over competitors).

     In Campbell Soup Co., upon an employee's resignation and
acceptance of employment at a competing company, the Campbell
Soup Company ("Campbell") sought to enforce a non-competition
agreement prohibiting (1) employment with a competitor for 18
months upon termination, and (2) from use or disclosure of the
company's confidential information.  58 F.Supp.2d at 481-82.  The
employee, Desatnick, had been a member of Campbell's "Leadership
Group" consisting of senior executives who met monthly to
discuss, inter alia, strategic planning.  Id. at 482.  Desatnick
claimed because he was not a member of Campbell's more
restrictive "Senior Leadership Team," he was not part of the
company's decision-making process and possessed no confidential
information.  Id.  The Court, however, found that Desatnick was

in fact "part of the important management team that planned and
reviewed the company's performance," and was "privy to some of
the most guarded corporate strategic secrets" over the course of
his employment.  Id. at 482, 485.  Particularly, the Court found
Desatnick's attendance at sensitive strategy sessions concerning
a new advertising campaign significant, as they alerted employee
to the company's plans for "brand positioning and pricing in the
marketplace, its plans for resource allocation among product
lines within the company, and its perceptions of the brands'
strengths and vulnerabilities." Id. at 490.  The Court noted
that Desatnick participated in formulating this initiative during
the time he was interviewing for the position with the
competitor.  Id. at 485.

     In a similar manner, Strom is aware that NRI recently
entered into a new venture by spending considerable sums and
substantial energy to acquire Triangle and turn it into a
profitable enterprise.  He is aware that NRI has since spent
considerable sums of capital investment to upgrade Triangle's
equipment.  Strom, during the last year of his employment,
attended at least one such NRI management meeting – during a time
he was simultaneously engaging in conversations and meetings
with, as well as providing advice to, FLMG representatives
regarding employment opportunities in New Jersey – at which
highly sensitive and confidential business information about the

48

New Jersey branches and market were discussed.  Strom was privy
to information regarding NRI's plan to grow the color business to
expand its market position.  He was aware of what software was
being considered by NRI, and of the equipment already purchased
for the endeavor, and received lists of customers NRI planned to
target.  Although Strom only attended one SBP meeting at which
Teti presented information, and has had no interaction with Teti
since this meeting, as a trusted high-level employee of NRI, he
was privy to the development of the strategies for the market.
Strom now seeks to work for a company competing in the same
market.

It should be noted that FLMR itself seeks to protect its own
confidential information through the non-competition provision it
planned on requiring Strom to sign, evidencing its recognition
that there is or can be valuable confidential trade secret
information within the industry.  See Platinum Mgmt., 666 A.2d at
1038; Nat'l Starch & Chem. Corp. v. Parker Chem. Corp., 530 A.2d
31, 33 (N.J. App. Div. 1987) (injunction warranted where employee
signed an agreement stating she understood that "the misuse or
disclosure of [trade secrets] would irreparably damage the
company").

The evidence, in sum, reveals that Strom was exposed to a
considerable amount of information of the type that is entitled
to protection under New Jersey law.  NRI has a legitimate

business interest in preventing Strom from using this information to its disadvantage on behalf of FLMR, which is its primary competitor in the New Jersey and nearby Pennsylvania metropolitan markets.  The Court thus finds that NRI has made a sufficient showing that its corporate interests in enforcing the non-competition agreement as to Strom are deserving of protection.

### D.   Enforcement of the Clause is not an Undue Hardship on Strom

An employee must show more than mere "personal hardship" for the court to find an undue hardship would exist if a particular non-competition restriction is enforced.  <u>Karlin</u>, 390 A.2d at 1169.  The inquiry should look to the "likelihood of the employee finding work in his field elsewhere."  <u>Id.</u>  A court should also consider the reason for the termination of the employment agreement between the parties.  <u>Id.</u>  "Where the breach results from the desire of an employee to end his relationship with his employer rather than from any wrongdoing by the employer, a court should be hesitant to find undue hardship on [the employee]."  <u>Id.</u>

The Court finds that the restrictive covenant at issue in this case does not cause undue hardship to Strom.  Strom was not forced to leave NRI; he voluntarily resigned.  The restriction does not impose any limitations on his ability to work for a competing business outside of the 50-mile radius.  Nor does it prevent him from engaging in his livelihood, which he

50

specifically acknowledged upon signing the Agreement.  See
Platinum Mgmt., 666 A.2d at 1038 (finding no undue hardship
because restriction did not prevent employee from earning a
livelihood).  Strom did not object to this Agreement, nor attempt
to negotiate different terms.  Moreover, Strom has not yet
started work with FLMR.  Strom, FLMG, and FLMR were aware of the
non-competition provision in Strom's NRI employment contract, and
knew that NRI had established acquired branches in New Jersey in
October 2007.  The Court thus finds the non-competition clause
does not cause undue hardship on Strom.

### E.   The Public Interest

If a restrictive employment agreement will be injurious to
the public, it will not be enforced.  Karlin, 390 A.2d at 1168.
"The public has a clear interest in safeguarding fair commercial
practices and in protecting employers from theft or piracy of
trade secrets, confidential information, or, more generally,
knowledge and technique in which employer may be said to have a
proprietary interest."  Ingersoll-Rand Co., 542 A.2d at 894; see
also Campbell Soup Co., 58 F.Supp.2d at 489.  Moreover, "the
public has a great interest in upholding and enforcing freely
negotiated contracts entered into between employees and their
employers."  Manhattan Assocs., 2005 U.S. Dist. LEXIS 45132, at
*7.

51

FLMR remains free to compete with customers in the New Jersey and Philadelphia metropolitan markets.  Greater injury is likely to result from failing to grant the requested injunction relief in this case.  NRI bargained with Strom, whom it inserted into a high-level position within the company and gave access to sensitive company information, to prevent disclosure of confidential business information to competitors.  The public interest favors the enforcement of reasonable terms contained in employment contracts.

Upon considering all of the factors, the Court finds there is an enforceable employment contract between Strom and NRI, and that the employment restriction imposed on Strom was reasonable under the circumstances.  NRI has thus met its burden of a <u>prima facie</u> showing of reasonable probability of success on the merits.

## II.  Irreparable Injury

"In general, to show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.  Economic loss does not constitute irreparable harm."  <u>Acierno v. New Castle County</u>, 40 F.3d 645, 653 (3d Cir. 1994) (citations and quotations omitted).  "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will."  <u>Kos Pharms. v. Andrx Corp.</u>, 369 F.3d 700, 726 (3d Cir. 2004) (quotation and citation omitted).  Further, irreparable harm must be of a

peculiar nature and must be incapable of pecuniary measurement. See id. at 727; Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91-92 (3d Cir. 1992).

During his three-year tenure at NRI, Strom enjoyed unfettered access to NRI's business strategies.  Given FLMR's stature as a direct competitor and Strom's significant involvement and participation in NRI's strategic business decisions, as well as his knowledge of NRI's strategies for its New Jersey branches, use of this information in his capacity for FLMR is potentially inevitable even in the absence of the underlying NRI documents.  There is no question that using NRI's confidential information and proprietary information for the benefit of its competitors could potentially destroy NRI's business, built over 100 years.

Defendants' arguments focus on the contentions that Strom, after spending three years in a high-level position at NRI, cannot remember, or was not exposed to, any sensitive information that is not already generally known in the industry.  Defendants do not directly argue that NRI will not sustain irreparable harm if Strom is permitted to work for FLMR.  Under the circumstances presented, NRI is likely to suffer irreparable harm to its business that is not capable of pecuniary measurements.  See Nat'l Starch & Chem. Corp., 530 A.2d at 33 ("Damages will not be an adequate remedy when the competitor has obtained secrets.  The

cat is out of the bag and there is know way of knowing to what
extent their use has caused damage or loss.")

## III. Harm to Nonmoving Party

The Court must also analyze whether the defendants will
suffer irreparable harm if the preliminary injunction is granted.
Kos Pharms., 369 F.3d at 727.  If the Court finds that such
temporary relief may irreparably harm the defendant, then it must
"balance the hardships" to ensure that the injunction does not
harm the defendants more than denial of the injunction would harm
the plaintiff.  Id.; see also Constr. Drilling v. Chusid, 63
F.Supp.2d 509, 513 (D.N.J. 1999) (stating that courts must
"balance the hardships to the respective parties" in determining
whether to issue a preliminary injunction).  The "injury a
defendant might suffer if an injunction were imposed may be
discounted by the fact that the defendant brought that injury
upon itself."  Kos Pharms., 369 F.3d at 728 (citation and
quotations omitted).  Further, "[i]rreparable harm must be of a
peculiar nature, so that compensation in money alone cannot atone
for it."  Id. at 727 (quotation and citation omitted).  Thus, the
Court should not consider financial damages when deciding whether
to grant an injunction.  Id. at 728.

Strom has not yet started working for FLMR, although he has
already left his job with NRI.  He was well aware of the
restrictions of the Agreement when he signed it in August 2005,

54

and knew that NRI had acquired Triangle in October 2007.
Moreover, FLMR and FLMG can continue to operate its business as
before and are free to compete against NRI, but must do so
without relying on the benefits of Strom's NRI-derived knowledge
and experience during the limited duration of the contractual
restriction.  The balance of hardships in this case thus favors
NRI.

**IV.  The Public Interest**

The preliminary injunction analysis again requires the Court
to consider the public interest.  See AT&T Co., 42 F.3d at 1427
n.8 (noting the public interest will almost always favor the
plaintiff, if the plaintiff demonstrates both a likelihood of
success on the merits and irreparable injury).  As discussed
supra, the Court finds that enforcing reasonable terms of an
employment agreement is within the public interest.

CONCLUSION

The Court, for the reasons stated supra, will grant NRI's
application for a preliminary injunction.  The Court will issue
an appropriate order separately.

                              ___s/ Mary L. Cooper_____
                              **MARY L. COOPER**
                              United States District Judge

55